THE CITY OF KINGS MOUNTAIN, A MUNICIPAL CORPORATION v. COLEMAN GOFORTH AND WIFE, MARY B. GOFORTH, C. A. HORN, TRUSTEE, FIRST CITIZENS BANK AND TRUST COMPANY, KINGS MOUNTAIN, J. HAROLD McKIETHEN, PRUDENTIAL LIFE INSURANCE COMPANY, AND THE COUNTY OF CLEVELAND

No. 81

(Filed 9 May 1973)

1. **Eminent Domain § 15—** condemnation proceeding — right to possession — passage of title

   In a condemnation proceeding under G.S. 40-11 *et seq.*, the condemnor acquires no right to possession until it pays into court the value of the subject property as determined by appraisers; it acquires no title to the property until it obtains a final judgment and pays to the landowner the amount of compensation fixed by such judgment.

2. **Eminent Domain § 15—** condemnation proceeding — right to possession — growing crops on land

   Absent unusual circumstances, the landowner may continue to use his property from the commencement of a condemnation proceeding under G.S. 40-11 *et seq.* until the payment into court by the condemnor of the value of the property as determined by commissioners to the same extent and in the same manner in which he had

been using it prior to the commencement of the condemnation proceeding; consequently, if the owners of land subject to such a proceeding had planted crops on the land in the years prior to commencement of the proceeding, they had a right to plant, cultivate and harvest crops on such land until their right to possession was terminated by the condemnor's payment into court of the amount of value of the property as determined by commissioners.

3. **Water and Watercourses § 1— obstruction of surface stream — flooding of upper lands — liability for damages**

If a lower landowner obstructs a surface stream of water so as to prevent the water from flowing as it naturally would and thereby flood the lands above him, he incurs liability for the damage caused by such flooding; since the respective rights of the upper and lower proprietors are property rights, the invasion thereof, not negligence, affords the basis for recovery.

4. **Eminent Domain § 13; Water and Watercourses § 1— obstruction of surface stream — trespass — right to condemn — inverse condemnation**

Ordinarily, the invasion of a property right of the upper proprietor by the lower proprietor would constitute a trespass which would entitle the aggrieved party to damages or injunctive relief or both; however, if a property right of the upper proprietor is invaded by a party that has authority to condemn this property right, such invasion constitutes a "taking" of the landowner's property and the action becomes in effect an action for "inverse condemnation."

5. **Water and Watercourses § 4— flooding caused by dam construction — damage to crops — sufficiency of evidence for jury**

Defendants' evidence was sufficient for the jury in their cross-action for damages to their crops from flooding allegedly caused by plaintiff municipality's construction of a dam on a creek where it tended to show that the municipality had installed a pipe having a diameter of five feet which provided the only means for flow of the creek waters through the dam under construction, that the creek twice overflowed during heavy rains while the dam was under construction and flooded defendants' 40-acre tract above the dam, that crops on the 40 acres were completely under water for two to three weeks on each occasion and were totally destroyed, and that when the 40 acres were flooded on two occasions prior to construction of the dam the water subsided within a few hours and caused no material damage to crops.

6. **Pleadings § 2; Rules of Civil Procedure § 50— motion for directed verdict — erroneous label of ground for relief**

If defendants are entitled to relief under their allegations and evidence, plaintiff is not entitled to a directed verdict because defendants erroneously named "negligence" rather than "trespass" or "inverse condemnation" as the ground on which they are entitled to recover.

APPEAL by defendants Goforth from judgment of *Judge Harry C. Martin* entered at 18 September 1972 Session of

CLEVELAND Superior Court, transferred for initial appellate review by the Supreme Court by order dated 26 March 1973 entered pursuant to G.S. 7A-31(b)(4).

The record before us shows that, on 3 September 1969, Kings Mountain, a Municipal Corporation, filed its petition in this condemnation proceeding. Although this petition was not included therein, the record before us implies that the proceeding was to condemn described Goforth land in connection with the construction and maintenance of a new water system. This was confirmed on oral argument by statements of counsel for plaintiff and for defendants Goforth. Counsel also stated that the land which is the subject of the Goforth cross-action is a part of the Goforth land involved in the Kings Mountain condemnation proceeding.

The first pleading in the record before us is the answer and cross-complaint filed by defendants Goforth on 24 February 1971. This pleading contains a denial of the essential allegations in Kings Mountain's petition; it alleges further answers and defenses to Kings Mountain's asserted right to condemn; and it alleges a cross-action for damages. On 20 September 1972, Kings Mountain filed an answer to the Goforth cross-complaint.

In their cross-complaint, the Goforths alleged that their property included bottom land on Buffalo Creek; that, in August 1970 and in February 1971, the dam constructed by Kings Mountain caused the waters of Buffalo Creek to flood and completely destroy their crops; that, in constructing the dam, Kings Mountain only allowed drainage by a pipe five (5) feet in diameter when it knew or should have known that this pipe would not provide adequate drainage; that the loss of their crops was caused solely by the negligence of Kings Mountain; and that they had been damaged to the extent of $10,000.

Kings Mountain's reply, in addition to general denials, alleged as a further defense the following: Buffalo Creek had overflowed on numerous occasions and the Goforths knew or should have known that their bottom land was subject to flood conditions during heavy rainfall. The Goforths also had full knowledge that the dam was under construction. Kings Mountain had taken precautions against ordinary flood conditions. The flood conditions which caused damage to the Goforths' crops were caused by an extraordinary and unprecedented rainfall which Kings Mountain did not and could not reasonably antici-

pate. Too, the accumulation of water on the Goforth lands was caused in part by the bursting of a dam of upper landowners.

In addition, Kings Mountain alleged that the flooded Goforth land was part of the lands which had been condemned and valued as of 3 September 1969, prior to the planting of the crops referred to in the Goforth cross-action; and that the Goforths planted these crops with full knowledge that these lands were to be taken by Kings Mountain as of 3 September 1969.

The record contains this statement: "Cross-action severed by the Honorable Lacy H. Thornburg on September 28, 1971."

It was stipulated that defendants Goforth were the owners of the land upon which the crops referred to in this action were growing; also, that Kings Mountain had installed a pipe having a diameter of five feet which provided the only means for the flow of Buffalo Creek waters "through the dam which was under construction."

The only evidence was that offered by defendants Goforth. It consists of the testimony of defendant Coleman Goforth, of Buford Cline, the owner of bottom lands across the creek from those of the Goforths, and of W. K. Dickson, an engineer, who had been employed by Kings Mountain in connection with the Kings Mountain Buffalo Creek Water Project Reservoir. Their evidence tended to show the facts narrated below.

The Goforths' bottom land consisted of 40 acres on Buffalo Creek which had been used in "grain farming" for over twenty-one years. This bottom land was within the area from one-half mile to three miles north of the dam built by Kings Mountain.

In August 1970 the Goforths had "a fine looking crop [of milo] in the heading stage" on the 40 acres. For about three weeks in early August, this crop was completely covered by water. When the water subsided the crop was entirely lost. In early February 1971, the Goforths had a crop of Blueboy wheat "12 inches high" on the 40 acres. On 7 February 1971, and for two weeks thereafter, this crop was flooded and was "of no value after the water subsided."

Prior to August 1970, the creek had been out of its banks on only two occasions, once in 1951 and again "several years later." On these occasions the creek overflowed its banks during the night but had subsided by the next morning and was never

out of its banks "over a few hours." "On neither occasion were the crops hurt." At the time of the August flooding, the portion of Buffalo Creek south of the dam "looked as though it had not rained" except for the fact that the water was muddy. The water immediately north of the dam "was a lake-looking situation. . . ." The five-foot drainpipe immediately south of the dam "was running full."

Dickson, the engineer, testified that the rain "on August 9 and 10, 1970, was a very unusual and very high rainfall"; that a dam at the Dover Mill, "not very large," located four or five miles upstream from the Goforth property "broke during this particular time"; that the five-foot pipe was "to protect the dam during construction and with very little consideration of what would happen to the land above the dam"; that it was expected when the plans were drawn that Kings Mountain would be the owner of the land above the dam when construction started; that the construction had been delayed for about three years; and that when the floodings occurred the dam "was over half built."

There was other evidence bearing upon the amount of damages suffered by the Goforths on account of the loss of their crops. This evidence is not pertinent to decision on this appeal.

At the conclusion of the evidence of defendants Goforth, Kings Mountain moved for a directed verdict of dismissal of the cross-action under Rule 50, Rules of Civil Procedure, G.S. 1A-1. The court allowed this motion on the stated ground that defendants Goforth had failed to show that their property was damaged by the negligence of Kings Mountain. Judgment dismissing the cross-action and taxing defendants Goforth with the costs was entered.

Defendants Goforth excepted and appealed.

*Jack White and Verne E. Shive for plaintiff appellee.*

*Horn, West, Horn and Wray by C. A. Horn for defendant appellants.*

BOBBITT, Chief Justice.

Municipal corporations have the right of eminent domain for the purpose of acquiring private property to construct and maintain a municipal water system. G.S. 40-2(2). The procedure

applicable to the condemnation proceeding now under considera-
tion is that prescribed by G.S. Chapter 40, "Eminent Domain,"
Article 2, "Condemnation Proceedings," G.S. 40-11 *et seq.* Un-
der this procedure, after the filing of the petition and answer,
commissioners are appointed to appraise the subject property.
G.S. 40-12; G.S. 40-16; G.S. 40-17. If the condemnor, "at the
time of the appraisal, shall pay into court the sum appraised by
the commissioners, then and in that event the said [condemnor]
may enter, take possession of, and hold said lands, notwithstand-
ing the pendency of the appeal, and until the final judgment
rendered on said appeal." G.S. 40-19. "The title of the landowner
is not divested unless and until the condemnor obtains *a final
judgment* in his favor *and* pays to the landowner *the amount of
the damages fixed by such final judgment.* G.S. 40-19; *Light Co.
v. Manufacturing Co.,* 209 N.C. 560, 184 S.E. 48." *Topping v.
Board of Education,* 249 N.C. 291, 299, 106 S.E. 2d 502, 508
(1959). [Note: The alternative provisions for condemnation by
municipal corporations enacted by Chapter 698, Session Laws of
1971, now G.S. 160A-240 *et seq.,* are not applicable to proceed-
ings pending on 1 January 1972.]

The procedure prescribed by G.S. 40-11 *et seq.* was applica-
ble to condemnation proceedings instituted by the State High-
way Commission *prior to 1 July 1960.* The procedure presently
applicable to condemnation proceedings *by the State Highway
Commission* is prescribed by the 1959 statutes now codified in
G.S. Chapter 136, "Roads and Highways," Article 9, "Condemna-
tion," G.S. 136-103 *et seq.* Under these statutes, title and im-
mediate right to possession are vested in the State Highway
Commission upon the filing of the complaint, the declaration
of taking, and the deposit in court of the amount of the esti-
mated compensation stated in the declaration. G.S. 136-104.
*Highway Commission v. Industrial Center,* 263 N.C. 230, 139
S.E. 2d 253 (1964). This change in the law must be kept in
mind when considering decisions involving the exercise of the
right of eminent domain by the State Highway Commission.

When the Highway Commission exercises its right of emi-
nent domain in accordance with G.S. 136-103 *et seq.,* "the right
to compensation rests in the person who owned the land im-
mediately prior to the filing of the complaint and declaration
of taking. He has nothing he can sell pending ascertainment of
fair compensation. Formerly, since his title was not divested
until compensation was paid, he could sell, G.S. 40-26. The per-

son who owned when the award was confirmed was the person to be compensated. *Liverman v. R. R.*, 109 N.C. 52, 13 S.E. 734. The Highway Commission, when it files its complaint, must file a memorandum of its action with the register of deeds where the land lies, G.S. 136-104. This has the same effect as a conveyance of the property." *Highway Commission v. Industrial Center, supra,* at 232, 139 S.E. 2d at 255.

In a condemnation proceeding under G.S. 40-11 *et seq.,* ordinarily, "for the purpose of determining the sum to be paid as compensation for land taken under the right of eminent domain, the value of the land taken should be ascertained as of the date of the taking, and . . . the land is taken within the meaning of this principle when the proceeding is begun." *Power Co. v. Hayes,* 193 N.C. 104, 107, 136 S.E. 353, 354 (1927) ; *Ayden v. Lancaster,* 197 N.C. 556, 559, 150 S.E. 40, 42 (1929) ; *Charlotte v. Spratt,* 263 N.C. 656, 662, 140 S.E. 2d 341, 345 (1965).

[1] Although the value of the land is to be determined as of the date the condemnation proceeding is commenced, much time may elapse from this date until the condemnor obtains the right to possession and a final judgment. The condemnor acquires no right to possession until it pays into court the value of the subject property as determined by the appraisers; it acquires no title to the property until it obtains a final judgment and pays to the landowner the amount of compensation fixed by such judgment. The principal amount of the judgment is the value of the subject property as of the date the special proceeding is commenced *as finally determined* by jury verdict or otherwise, whether more or less than the valuation placed thereon by the commissioners, with interest thereon from the date the condemnor acquired the right to possession thereof by payment into court of the amount of the valuation as fixed by the appraisers. *Winston-Salem v. Wells,* 249 N.C. 148, 105 S.E. 2d 435 (1958) ; *Light Co. v. Briggs,* 268 N.C. 158, 150 S.E. 2d 16 (1966).

In *Winston-Salem v. Wells, supra,* the proceeding was instituted on 8 February 1956; the amount fixed by the appraisers was paid into court on 30 March 1956; and the court held that the landowner was entitled to interest from 30 March 1956 on the value of the property as determined in the superior court. In *Light Co. v. Briggs, supra,* the condemnation proceeding was instituted on 2 April 1962; the amount of the damages

assessed by the commissioners was paid into court on 8 June 1962; and the landowners were held entitled to interest from 8 June 1962 on the value of the property as determined in the superior court.

[2] The cited decisions recognize the landowner's right to continue in possession of his property from the commencement of the special proceeding until the payment into court by the condemnor of the value of the property as determined by the commissioners. Until such payment is made, the landowner may sell the subject property; however, the special proceeding constitutes a *lis pendens*, giving notice to the purchaser that he succeeds to the status of the seller in the pending proceeding. G.S. 40-26; *Caveness v. R. R.*, 172 N.C. 305, 90 S.E. 244 (1916); *Hughes v. Hwy. Comm. & Oil Co. v. Hwy. Comm. & Equip. Co. v. Hwy. Comm.*, 275 N.C. 121, 165 S.E. 2d 321 (1969). Too, when the date for the attachment of the lien for taxes falls within this period, the landowner is obligated to list the subject property and pay the taxes thereon for such year or years. *Lumber Co. v. Graham County*, 214 N.C. 167, 198 S.E. 843 (1938). Without undertaking to define the limits upon the landowner's right to use the subject property during this period, it is clear that, absent unusual circumstances, he may continue to use it to the same extent and in the same manner in which he had been using it prior to the commencement of the condemnation proceeding. Hence, if the Goforths had planted crops on bottom lands referred to in the cross-complaint in the years prior to the commencement of the condemnation proceeding, they had the right to plant, cultivate and harvest crops on the bottom land until such time as their right to possession was terminated by the payment into court by Kings Mountain of the amount of the value of the subject property as determined by the commissioners.

The record contains *a notation* that the petition in the condemnation proceeding was filed 3 September 1969. It is silent as to all subsequent events in that proceeding except the portion of the Goforth pleading which relates solely to the allegations of the petition. Thus, the record does not disclose (1) when commissioners were appointed; (2) when Kings Mountain paid into court the amount of the commissioners' appraisal; (3) the value of the subject property as of 3 September 1969 as determined by the jury, and the court's instructions with reference thereto; and (4) the date and amount of the judgment

in the condemnation proceeding, including the date from which it provides for interest on the principal sum.

From the record, and from statements on oral argument, we infer that the crops referred to in the Goforth cross-complaint were planted and flooded during the period between the filing of the petition and the payment of the value of the Goforth property as determined by the commissioners. If so, the Goforths then had possession as a matter of right. Of course, absent special circumstances, the Goforths would not be entitled to recover if the crops were planted and flooded at a time when they had no legal right to the possession of the land.

Further consideration is upon the assumption that the Goforths had the legal right to the possession of the lands when the crops were planted and flooded, and that they have not been compensated by interest from the date the proceeding was instituted or otherwise for the period preceding the payment into court of the value of their property as fixed by the commissioners.

The burden of proof rests upon the Goforths to establish the liability of Kings Mountain and the amount of their damages. The question before us is whether the evidence, when considered in the light most favorable to the Goforths, was sufficient to withstand Kings Mountain's motion for a directed verdict. *Kelly v. Harvester Co.*, 278 N.C. 153, 157, 179 S.E. 2d 396, 397 (1971).

The applicable legal principles are as follows:

[3] "[A] lower owner cannot obstruct a surface stream of water, so as to prevent the water from flowing as it naturally would, and thereby flood the lands and buildings above him, and if he does so, he incurs liability for the damage done by such flooding." *Jones v. Loan Association*, 252 N.C. 626, 636, 114 S.E. 2d 638, 645 (1960), and cases cited.

"The surface of the earth is naturally uneven, with inequality of elevation. The upper and lower holdings are taken with a knowledge of these natural conditions, and the privilege or easement of the upper tenant to carry off the surface water in its natural course, under reasonable limitations, and the subserviency of the lower tenant to this easement are the natural incidents to the ownership of the soil. The lower surface is doomed by nature to bear this servitude to the superior and must receive the water that falls on and flows from the latter." *Miz-*

*ell v. McGowan*, 120 N.C. 134, 137, 26 S.E. 783, 784 (1897). The servient tenant "cannot set up a barrier to the flow of the water in its natural or accustomed channel if it will result in injury to his neighbors." *Clark v. Guano Co.*, 144 N.C. 64, 77, 56 S.E. 858, 863 (1907). Since the respective rights of the upper and lower proprietors are property rights, the invasion thereof, not negligence, affords the basis for recovery. *Braswell v. Highway Commission*, 250 N.C. 508, 108 S.E. 2d 912 (1959).

[4]  Ordinarily, the invasion of a property right of the upper proprietor by the lower proprietor would constitute a trespass which would entitle the aggrieved party to damages or injunctive relief or both. However, if a property right of the upper proprietor is invaded by a party that has authority to condemn this property right in the exercise of its power of eminent domain such invasion constitutes a "taking" of the landowner's property and the action becomes in effect an action for "inverse condemnation." See *Charlotte v. Spratt, supra,* and cases cited.

[5]  The evidence offered by defendants Goforth was sufficient to permit the following findings: In the two instances prior to August 1970 when the 40 acres were flooded, the water subsided within a few hours and caused no material damage. Both in August 1970 and in February 1971 the crops on the 40 acres were completely under water for periods of two or three weeks. The evidence is silent as to the impact of the breaking of the Dover Mill dam four or five miles upstream from the Goforth property. In any event, the breaking of the Dover Mill dam referred only to what occurred in August 1970. There was no material difference between the extent to which the Goforth land was flooded in August 1970 and the extent to which it was flooded in February 1971. The lands along Buffalo Creek south of the dam were not flooded.

Assuming, as the record before us implies, that the Goforths were the owners and entitled to the possession of the 40 acres when the crops were planted and flooded, we hold the evidence was sufficient for submission to the jury and to withstand the motion for a directed verdict in favor of defendant.

The decisions cited in Kings Mountain's brief are not pertinent to the present factual situation. Both *Bruton v. Light Co.*, 217 N.C. 1, 6 S.E. 2d 822 (1940), and *Bowling v. Oxford*, 267 N.C. 552, 148 S.E. 2d 624 (1966), involved actions by *lower* riparian owners against upper riparian owners for damages on account of negligence in the construction, maintenance or

operation of a dam. The other cited decision, *Letterman v. Mica Company*, 249 N.C. 769, 107 S.E. 2d 753 (1959), involved an action by an upper riparian owner on account of flooding allegedly caused by a dam maintained by a lower riparian owner. The demurrer of defendant English Mica Company was sustained on the ground that the complaint disclosed that the flooding of the plaintiff's land had not resulted from the construction or operation of the dam but because defendant Harris Clay Company, in its mining operations upstream from plaintiff, had put excessive amounts of dirt in the stream which came down and settled in the still water impounded by the dam and thereby caused the water to back upon the land and roadway of the plaintiff.

[6] Although the Goforths in their cross-complaint assert a right to recover on the ground of negligence, the claim which they allege is "sufficiently particular to give the court and the parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved showing that the pleader is entitled to relief. . . ." Rule 8, Rules of Civil Procedure, G.S. 1A-1. Their evidence tends to support their allegations. If defendants Goforth are entitled to relief under their allegations and evidence, Kings Mountain was not entitled to a directed verdict because defendants Goforth named "negligence" rather than "trespass" or "inverse condemnation" as the ground on which they were entitled to recover. *Paris v. Aggregates, Inc.*, 271 N.C. 471, 482, 157 S.E. 2d 131, 139-40 (1967). Of course, defendants Goforth would be entitled to recover damages only to the extent the flooding of the 40 acres and the damage to their crops was proximately caused by the dam then under construction by Kings Mountain.

Upon the record before us, the judgment of the court below must be and is reversed. The cause is remanded for trial consistent with legal principles stated herein. However, upon retrial the presiding judge may take into consideration pertinent facts, if any, which do not appear in the record before us, bearing upon whether (1) plaintiff was in rightful possession when the crops were planted and the land flooded, and (2) whether defendants Goforth have been compensated by interest or otherwise for the period from the date of the commencement of the condemnation proceeding until the payment into court by Kings Mountain of the valuation as determined by the commissioners.

Reversed.